FILED
2026 Jan-13 PM 02:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JUANITA JOHNSON, *individually and on behalf of the Class of similarly situated individuals,*<br>Plaintiff,<br><br>v.<br><br>SERVICE EXPERTS, LLC,<br>SERVICE EXPERTS HEATING &<br>AIR CONDITIONING LLC, AND<br>ADVANTAGE EXPERTS SERVICES<br>LLC,<br>Defendants. | Case No.: 2:26-CV-61-LCB<br><br>(JURY TRIAL DEMANDED) |

## CLASS ACTION COMPLAINT

Plaintiff Juanita Johnson, for her Class Action Complaint, states:

### INTRODUCTION

1.      This is a proposed class action against Service Experts, a national HVAC repair and sales conglomeration. Service Experts, through a web of agents, subsidiaries, and affiliates, has created a scheme called the "Advantage Program." The Advantage Program targets homeowners, many of which are elderly, through standardized and deceptive in-home sales tactics.

2.      Under the Advantage Program, Service Experts dispatches sales agents to convince homeowners to purchase a new HVAC system through "low-cost financing." However, Service Experts' sales agents do not tell the unsuspecting homeowners the Advantage Program involves a ten-year lease. The long lease period results in, at minimum, a doubling of the HVAC equipment's cost, and the terms of the lease prohibit the customer from owning the HVAC equipment.

3.      Service Experts' sales agents do not give homeowners a copy of the Advantage Program lease, or its terms and conditions while in the Plaintiffs' homes. Instead, the sales agent

1

obtains the customer's electronic "signature" on a tablet and installs the equipment. Service Experts then emails a "welcome letter" to the homeowner which does not mention that the Advantage Program involves a ten-year lease and exorbitant costs.

4.    When Advantage Program customers discover the ten-year lease, there is little they can do about it because that lease imposes an outrageous termination penalty. The customers end up trapped in a long-term lease that was sold to them by Service Experts as a low-cost financing program.

5.    The Advantage Program scheme is illegal. It violates the Federal Consumer Leasing Act, the Alabama Deceptive Trade Practices Act, and common law tort principles.

6.    Service Experts' treatment of Ms. Johnson is not isolated. Publicly available consumer complaints submitted to the Better Business Bureau and other consumer forums describe materially identical experiences with the Advantage Program across multiple states and years.[1]

7.    Consumers repeatedly report that Service Experts representatives presented the program as a low-monthly-payment solution during in-home visits, without clearly disclosing that the transaction was a long-term lease. Many complainants state that they did not receive complete paperwork at the time of signing, but instead received documents by email, after the representative had left. When consumers later attempted to cancel, refinance, or sell their homes, they were confronted with substantial early termination demands they did not anticipate at the time of sale.

8.    For example, one consumer complaint states that the homeowner "was never told this was a lease and only learned the true terms after receiving paperwork by email." Another

---

[1] *See e.g.,*https://www.bbb.org/us/tx/richardson/profile/heating-and-air-conditioning/service-experts-heating-air-conditioning-0875-19000269/complaints?page=2) (last visited December 16, 2025; https://www.reddit.com/r/legaladvice/comments/1fdpdpw/service_experts_advantage_program/#:~:text= They%20have%20a%20100%25%20satisfaction,the%20highest%20commission%20on%20advantage (last visited December 16, 2025).

reports being "told I could cancel anytime," only to later be presented with a large termination charge when attempting to exit the program.

9.     The volume, geographic spread, and consistency of these complaints placed Service Experts on notice that their standardized sales scripts and paperless contracting workflow were misleading consumers long before Ms. Johnson's transaction. Despite this notice, Service Experts .continued to market and sell the Advantage Program using the same practices.

10.     Ms. Johnson individually and on behalf of the Class of similarly situated individuals, brings this class action to end Service Experts' deceptive practices, to recover damages caused by Service Experts, and to recover statutory penalties.

## PARTIES

11.     Plaintiff, Juanita Johnson, resides in Center Point, Alabama, in Jefferson County. Ms. Johnson is 76 years old.

12.     Service Experts operates through a web of companies, subsidiaries, and affiliated agents. Service Experts started as a local company in Nashville, Tennessee, but it has undergone a transformation over the years as it has expanded nationwide. It has been bought and sold several times by large private equity firms and is now wholly owned by Brookfield Infrastructure, a global investment firm with over $1 trillion under management. *See* https://www.serviceexperts.com/about-us/history/ (last visited July 23, 2025).

13.     Defendant, Service Experts, LLC ("SE Corporate") is a Texas limited liability company with its principal place of business in Richardson, Texas. SE Corporate owns the registered mark for "Service Advantage Program." Although SE Corporate has no registered agent in Alabama, it regularly conducts business in Alabama through its direction and control of the marketing, coordination, supervision, and execution of its Advantage Program.

3

14.    Defendant, Service Experts Heating & Air Conditioning LLC ("SE HVAC"), is a Delaware limited liability company with its principal place of business in Richardson, Texas. Its registered agent in Alabama is the Corporation Service Company, Inc., 641 South Lawrence Street, Montgomery, Alabama, 36104. SE HVAC is a wholly owned subsidiary of SE Corporate and regularly conducts business in Alabama through its many HVAC stores that sell the Advantage Program. On information and belief, SE HVAC owns and/or controls the Alabama "Service Experts" companies such as Freedom Heating, AC & Plumbing ("Freedom.")

15.    Defendant, Advantage Experts Services LLC ("Advantage,") is a Delaware limited liability company with its principal place of business in Richardson, Texas. Its registered agent in Alabama is the Corporation Service Company, Inc., 641 South Lawrence Street, Montgomery, Alabama, 36104. Advantage is the Service Experts entity listed on the Advantage Program Agreements with customers. Advantage claims to have entered into lease agreements with Ms. Johnson on May 5, 2025 for an HVAC system installed in Center Point, Alabama.

16.    Defendants SE Corporate, SE HVAC and Advantage are sometimes referred to collectively as "Service Experts" because they work in concert to market, sell, and administer the Advantage Program in Alabama and across the United States under the Service Experts brand, as well as other related brands.

## JURISDICTION AND VENUE

17.    This Court has personal jurisdiction over Defendants through Fed. R. Civ. P. 4(k)(1) and Alabama's "long-arm statute," Alabama Rule of Civil Procedure 4.2.

18.    This Court has subject matter jurisdiction over this action pursuant to the Federal Consumer Leasing Act, 15 U.S.C.S. §1667d, and pursuant to 28 U.S.C.S §1332(d) because the aggregate claims of the Class exceed the sum or value of $5,000,000 and there is diversity of

citizenship between Plaintiff and all Defendants.

19.    Venue lies in this Court pursuant to 28 U.S.C.S. §1391(b)(2) because a substantial part of the events giving rise to this claim occurred in this district and the property that is the subject of the action is situated in this district. Venue also lies pursuant to 15 U.S.C.S. §1667d, which allows an action involving claims under the Federal Consumer Leasing Act to be brough in any district court in the United States.

## FACTS

20.    In May 2025, the air conditioning in Ms. Johnson's home stopped working. Ms. Johnson called her home warranty company for repairs.

21.    On May 5, 2025, the warranty company sent a technician from Freedom to Ms. Johnson's home. Freedom advertises itself as "A Service Experts Company." https://www.freedomhvacal.com/about-us/ (last visited September 26, 2025).

22.    During all events described herein, Freedom and its employees were acting as agents of Service Experts with both actual and apparent authority. Specifically, Freedom acted as the sales and contracting agent of Advantage in its dealings with Ms. Johnson, was controlled and supervised and/or owned by SE HVAC and was acting in concert with and at the direction of SE Corporate in selling the Advantage Program.

23.    On May 5, 2025, a technician from Freedom arrived at Ms. Johnson's home. After a short inspection of Ms. Johnson's equipment, the technician told Ms. Johnson that he did not think her home warranty company would cover the repairs to her equipment because the repair involved "coils." The technician told Ms. Johnson he would need to go out to his truck and call his supervisor to see whether the warranty company would cover the repairs.

24.    Minutes later, the technician returned with another Freedom employee, Brian

5

Morris. Mr. Morris told Ms. Johnson that the repairs were not covered and began selling Ms. Johnson on a new HVAC system.

25.     Ms. Johnson told Mr. Morris that she would get a new unit from Alabama Power if the home warranty company would not cover the repairs to her unit. Mr. Morris responded by telling Ms. Johnson she should not buy equipment from Alabama Power because Alabama Power is "very expensive" and "might cost her $11,000."

26.     Mr. Morris then told Ms. Johnson he could sell her "a new unit better than her old unit" by using the Advantage Program. Mr. Morris told Ms. Johnson the Advantage Program was financing that involved "low monthly payments" and that "many seniors used the Advantage Program because they get a good rate." Mr. Morris did not mention *anything about a lease* for the new HVAC equipment, or that Ms. Johnson *would not actually own the HVAC equipment* if she chose the Advantage Program.

27.     Mr. Morris told Ms. Johnson that to qualify for the Advantage Program, she would need to authorize a credit check by signing a digital tablet he brought with him. She agreed and signed a space on the screen of the tablet. Mr. Morris did not show Ms. Johnson a lease agreement or say anything about a lease while he was in Ms. Johnson's home. He did not show her or tell her about any "terms and conditions" while in her home.

28.     When Ms. Johnson asked for the price of equipment, Mr. Morris went into another room and filled out a handwritten order form. The handwritten form does not mention a lease. *See* Exhibit 1 attached hereto. The handwritten form does not list Ms. Johnson as the customer but instead provides: "Customer Name: Janita Armstrong." *Id*. The handwritten document is dated May 5, 2025.

29.     In the bottom corner of the order form, there is section entitled: "Payment Terms"

and "Grand Total." When Mr. Morris presented the form to Ms. Johnson, in the "Grand Total" space, Mr. Morris had written "9,900." Ms. Johnson signed the form. Later, someone scratched out "9,900" and wrote "16379" below. It is apparent that the document was altered after Ms. Johnson's signature because the one and six in "16379" are written over Ms. Johnson's signature:

30.     During the May 5, 2025 in-home sales pitch, neither Mr. Morris nor the technician ever (1) mentioned a lease, (2) showed Ms. Johnson a lease, (3) showed her any "Terms and Conditions," or (4) mentioned a right to cancel the agreement, and (5) left no paperwork with Ms. Johnson. Ms. Johnson, like many elderly victims before her, believed she was purchasing – not leasing –HVAC equipment.

31.     Relying on Mr. Morris' representation that the Advantage Program was simply financing with a low monthly rate, Ms. Johnson agreed to buy a new unit through the Advantage Program. She had no reason to believe that she might be agreeing to a ten-year lease that clouded title to her property and would cost over $30,000.

32.     On May 6, 2025, a Freedom employee named "Travis" arrived to install part of the equipment. Travis did not ask Ms. Johnson to sign anything on May 6.

33.     On May 7, 2025, a Freedom employee named "Luke" arrived at Ms. Johnsons' home and installed the rest of the equipment. Luke had Ms. Johnson sign a certificate of

7

installation.

34.    On May 8, 2025, the newly installed HVAC equipment stopped cooling the house and started blowing hot air. Ms. Johnson called Mr. Morris, who said Ms. Johnson's "air ducts were the problem" and tried to sell her new air ducts. Ms. Johnson refused and told Mr. Morris to send a technician to repair the equipment.

35.    On May 9, 2025, Travis from Freedom returned to fix the new equipment. He told Ms. Johnson that the equipment had been installed incorrectly and that he had fixed the problem.

36.    Later that evening, Ms. Johnson's daughter, Janita Armstrong, came for a visit. During their conversation, Ms. Armstrong became concerned about the events of the week and asked Ms. Johnson to show her the paperwork on the new HVAC unit. Since Mr. Morris did not leave any copies of the paperwork during his in-home sales call, Ms. Johnson had no paperwork. Ms. Armstrong then looked in Ms. Johnson's email inbox and discovered an email Service Experts had sent to Ms. Johnson on May 5. *See* Exhibit 2 attached hereto.

37.    The email was a "welcome letter" for the "Service Experts Advantage Program." The welcome letter mentioned nothing about a "lease." *Id.*

38.    Attached to the email were the following: (1) three "Service Experts Advantage Program Agreements;" (2) a document entitled "Advantage Terms and Conditions" which does not bear her signature; (3) three forms entitled "Notice of Cancelation;" and (4) a form entitled "Easy Pay Options." *See* Exhibit 3 attached hereto.

39.    The three Service Advantage Program Agreements state that the lessee and homeowner is "Juanita Armstong," not Juanita Johnson. *Id.* at 1, 3, and 5.

40.    The first Service Experts Program Advantage Agreement is for a Lenox Heat Pump, a Lenox Air Handler, and "Other." It calls for 118 monthly payments of $164.45 for a total of

$19,405.10. *Id.* at 1. It provides that the total "installed cost" of the equipment is $10,104. *Id.*

41.    The Second Service Experts Advantage Agreement is for an AO Smith Water Heater and an Eastman Expansion Tank. *Id.* at 3. It calls for 118 monthly payments of $63.79 for a total of $7,527.22. It provides the installed cost of the equipment is $3,694. *Id.*

42.    The third Service Experts Advantage Agreements is for a "UV/PCO" manufactured by "Dynamic," model number "Stage 4." *Id.* at 5. There is no further description of the equipment. It calls for 118 lease payments over ten years for a total cost of $4,996.12. It provides the total installed cost of the equipment is $2,581. *Id.*

43.    Therefore, after Service Experts discouraged Ms. Johnson from spending $11,000 with Alabama Power to purchase equipment because that was "expensive," it used aggressive and deceptive in-home sales tactics to try to get her to "lease" similar equipment for a total cost of $31,928.44.

44.    The three Service Experts Advantage Program Agreements state:

> G.    **Other important Terms**: See your **Lease** for additional information on early termination, maintenance responsibilities, warranties, late and default charges, insurance and any security interest.

Exhibit 3 at 1, 3, and 5 (emphasis added).

45.    Ms. Johnson was not provided a document entitled "Lease" that contains "additional information" at any time. At no point before signing did Defendants provide Ms. Johnson a complete copy of the lease and terms in paper or in an onsite-retainable electronic form.

46.    The "Advantage Terms and Conditions" attached to the email were not signed by Ms. Johnson and she never saw them prior to May 9. None of the Service Advantage Agreements mention or incorporate a document entitled "Advantage Terms and Conditions." *See,* Exhibit 3.

47.    The Advantage Terms and Conditions document states that if a customer chooses

to terminate her lease in the first year, she owes 100 percent of "total installed costs." *Id.* at 7. This is an early termination penalty of $16,379 – nearly 49 percent higher than the quoted "expensive" price charged by Alabama Power.

48.    The Advantage Terms and Conditions document also contains forced arbitration and class action waiver provisions. *Id.* at 8. Mr. Morris did not provide, show, or tell Ms. Johnson about the Advantage Terms and Conditions, its arbitration, or its class waiver clauses during his in-home sales call.

49.    The three documents entitled "Notice of Cancellation" all list "Juanita Armstrong" as the customer and state that she may cancel "this transaction" by May 8, 2025– three days following the "date of transaction" listed as May 5, 2025. *Id.* at 16-18.

50.    Because Service Experts did not provide the Notices of Cancellation prior to the transaction as is required by law, Ms. Johnson did not see them until May 9, 2025. Ms. Johnson also did not see the Service Experts Advantage Program Agreements or the Advantage Terms and Conditions until May 9, 2025.

51.    Ms. Johnson has been subject to collection efforts by Service Experts and faces a threat of credit reporting, and clouding of title to her property.

## CLASS ALLEGATIONS

52.    Ms. Johnson brings this class action pursuant to Federal Rule of Civil Procedure 23 on behalf of herself and all others similarly situated as a representative of the following class and subclass:

### A. Nationwide Class

All natural persons in the United States who entered into an Advantage Program agreement within the applicable limitations period and remain subject to Defendants' asserted payment,

termination fees, collection, credit-reporting, or title-notice remedies.

### B. Alabama Subclass

All natural persons in the Alabama who entered into an Advantage Program agreement within the applicable limitations period and remain subject to Defendants' asserted payment, termination fees, collection, credit-reporting, or title-notice remedies.

53.     Excluded from the Class and Subclass are Defendants, their officers, directors, and employees, any entity which Defendants have controlling interest in, are a parent or subsidiary of, or which is otherwise controlled by Defendants, and Defendants' affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assignees. Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

54.     Ms. Johson reserves the right to modify or amend the Class definitions, including but not limited to creating additional subclasses.

55.     *Numerosity.* The members of the Class are so numerous that joinder of all members is impracticable. Ms. Johnson believes the Class include thousands of people. The precise number of Class members is unknown but may be ascertained from Defendants' records.

56.     *Commonality.* There are numerous questions of law and fact common to the Class relating to Defendants' business practices challenged herein, and those common questions predominate over any questions affecting only individual Class members. The common questions include, but are not limited to:

- Whether Defendants failed to make the disclosures required under the Federal Consumer Leasing Act;

- Whether Defendants imposed an unreasonable termination penalty in violation of the Federal Consumer Leasing Act;

- Whether Defendants engaged an unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce in violation of the Alabama Deceptive Trade Practices Act;

11

- Whether Defendants have designed a sales system for the Advantage Program that results in fraud, misrepresentation, suppression, deceit during contracting.

57. *Typicality.* Ms. Johnson's claims are typical of the claims of the other Class and Subclass members in that they arise out of the same wrongful business practices used by Defendants, as described herein.

58. *Adequacy of Representation.* Ms. Johnson is an adequate representative of the Class because she sustained damage caused by Defendants' uniform conduct and is entitled to statutory damages. Ms. Johnson is committed to the vigorous prosecution of this action individually and on behalf of all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers regarding financial transactions. There is no hostility of interest between Ms. Johnson and the unnamed Class members. Ms. Johnson anticipates no difficulty in the management of this litigation as a class action and Ms. Johnson's legal counsel has the financial and legal resources to meet the substantial costs and legal work associated with this type of litigation.

59. *Predominance.* The questions of law and fact common to the Class as set forth in the "commonality" allegation above predominate over any individual issues. As such, the "commonality" allegations are restated and incorporated herein by reference.

60. *Superiority.* A class action is superior to other available methods and highly desirable for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is very small relative to the complexity of the litigation and since the financial resources of Defendants are significant, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Defendants' misconduct will proceed without remedy. In addition, even if Class members themselves could afford such individual litigation, the court

system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COUNT I:
## VIOLATION OF FEDERAL CONSUMER LEASING ACT
## AGAINST ADVANTAGE
### (on behalf of the Nationwide Class)

61.     Ms. Johnson incorporates the foregoing allegations here by reference.

62.     The Federal Consumer Leasing Act requires lessors to give lessees "prior to the consummation of the lease a dated written statement" containing a description of the leased property, payment and fee information, a statement of the warranties and guarantees made, and conditions under which the lease may be terminated. 15 U.S.C.S. §1667a ("Section 1667a.")

63.     Pursuant to Regulation M, "the disclosures shall be made clearly and conspicuously in writing in a form the consumer may keep, in accordance with this section." 12 C.F.R. §1013.3(a).

64.     The Federal Consumer Leasing Act also prohibits lessors from charging and unreasonable penalties for default, delinquency or early termination of the lease. 15 U.S.C.S §1667b ("Section 1667b.")

65.     Any lessor who fails to comply with the requirements of Section 1667a or Section 1667b of the Federal Consumer Leasing Act is liable as provided under 15 U.S.C.S §1640 ("Section 1640.") Those damages include actual damages, attorney's fees and costs, and 25 per cent of the total amount of monthly payments due under the lease. In the case of class action, the court may award the class not more than $1,00,000 or 1 per centum of the net worth of the creditor,

except that as to each member of the class no minimum recovery shall be applicable. *Id.*

66.   The purported Service Advantage Agreements are "consumer leases" because they are leases for the use of personal property by a natural person for a period time exceeding four months and for a total contractual obligation not exceeding $50,000 for primarily personal, family and household purposes. 15 U.S.C.S §1667(1). Advantage is a "lessor" and Ms. Johnson is a "lessee" as defined by the Federal Consumer Leasing Act. 15 U.S.C §1667(2)-(3).

67.   Advantage did not comply with the disclosure requirements of Section 1667a of the Federal Consumer Leasing Act prior to the time Advantage claims a lease was consummated with Ms. Johnson on May 5, 2025. She did not receive the disclosures prior to the transaction.

68.   Ms. Johnson relied on Advantage's misleading, false, and incomplete disclosures about the nature of the Advantage Program. She thought she was agreeing to a purchase "with low monthly payments" that was "less expensive" than $11,000 – not three ten year leases totaling over $30,000 whereby she would never own the equipment in her own home.

69.   Advantage's purported lease agreements do not comply with Section 1667b of the Federal Consumer Leasing Act because those lease agreements impose unreasonable penalties in connection with termination of the leases. Advantage's purported lease agreements require termination penalties that far exceed the fair market value of the equipment.

70.   Advantage's own documents confirm that Advantage understood the Advantage Program to be a consumer lease. The agreements emailed to Ms. Johnson after the in-home signing include a prominently labeled "Federal Consumer Leasing Act Disclosures."

71.   As a direct and proximate cause of Advantage's violation of the Federal Consumer Leasing Act, Plaintiff and members of the Class were harmed in the amount they paid for HVAC equipment under the Advantage Program, termination penalties they paid, the liens wrongfully

placed on their homes, and are entitled to those damages, as well 25 percent of the total monthly payments due under the Advantage Program leases, and their attorney's fees and costs.

**COUNT II:**
**ALABAMA DECEPTIVE TRADE PRACTICES ACT**
**AGAINST ALL DEFENDANTS**
**(On behalf of the Alabama Subclass)**

72.     Ms. Johnson incorporates the foregoing allegations here by reference.

73.     The Alabama legislature adopted the Alabama Deceptive Trade Practices Act in 1981, codified at Ala. Code §8-19-1 *et seq*. "The primary intent of the statutes is the promotion of meaningful disclosure to allow a consumer to make an intelligent choice concerning purchases of products or services. Its goal is an attempt to put a consumer in a better, if not equal, bargaining position." 1 Alabama Tort Law §20.23 (2025).

74.     The Alabama Deceptive Trade Practices Act defines "consumer" as a person "who buys goods or services for personal, family or household use." Ala. Code §8-19-3(2). In the statute, "goods" are defined as including but not limited to: "any property, tangible or intangible, real, personal, or any combination thereof, and any franchise, license, distributorship, or other similar right, privilege, or interest." Ala. Code §8-19-3(3) (1993). "Services" are defined as "work, labor, and other services, including but not limited to services furnished in connection with the sale or repair of goods." *Id.* §8-19-3(7).

75.     Ms. Johnson acted as a consumer of goods and services as defined by the Alabama Deceptive Trade Practices Act.

76.     Under the Alabama Deceptive Trade Practices Act, it is unlawful to use any "unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code §8-19-5 (27). Any person who commits an act declared unlawful under the Alabama Deceptive Trade Practices Act and thereby causes damage to a consumer is liable to the

15

consumer for up to three times their actual damages and their costs and attorney's fees. Ala. Code §8-19-10.

77. Defendants used unconscionable, false, misleading, and deceptive acts and practices in executing their Advantage Program scheme. Defendants have created a system designed to hide the nature of the financial transactions at issue, routinely commit fraud in the inducement and execution to obtain signatures for the Advantage Programs, and have enforced and attempted to enforce an unconscionable termination penalty against Ms. Johnson and members of the Class many of which are elderly.

78. Additionally, under the Federal Trade Commission's "Cooling-Off Rule" (16 C.F.R. Part 429), in-home solicitations of greater $25 require a 3-day cancellation notice and specific written forms at the time of a transaction. No such forms were provided to Ms. Johnson at the time of the transaction, and as a matter of normal procedure, Defendants provide no such forms at the time of transaction.

79. As a direct and proximate cause of Defendants' violation of the Alabama Deceptive Trade Practices Act, Plaintiff and members of the Class were harmed in the amount they paid for HVAC equipment under the Advantage Program, termination penalties they paid, the liens wrongfully placed on their homes, and are entitled to those damages, 25 percent of the total monthly payments due under the Advantage Program Agreements, the statutory damages available under the Alabama Deceptive Trade Practices Act, and their attorney's fees and costs.

**COUNT III:**
**FRAUDULENT MISREPRESENTATION/SUPPRESSION**
**AGAINST ALL DEFENDANTS**
**(On behalf of the Alabama Subclass)**

80. Ms. Johnson incorporates the foregoing allegations here by reference.

81. In connection with the in-home solicitation and sale of the "Advantage Program,"

Defendants had a duty to disclose material facts, including that the transaction was a lease (not a purchase/financing), the total cost over the term, early termination penalties, lien/encumbrance practices, cancellation rights, any Cooling-Off Rule rights, and the presence of any forced arbitration or class-action waiver provisions. The duty arose not only from specific statutes and regulations, but also from Defendants' partial disclosures, superior knowledge, and the in-home and high pressure context.

82.     Defendants willfully and intentionally suppressed and concealed these material facts with an intent to deceive.

83.     This misrepresentation, suppression, and concealment was not an isolated incident, but instead, is part of Defendants' normal operating procedure, as demonstrated by the numerous online complaints about the practice and the fact that the "welcome letter" emailed by Defendants does not disclose that the Advantage Program involves a ten year lease.

84.     Ms. Johnson reasonably relied on Defendants' misrepresentations, suppression and deceit and was induced to enter the transaction.

85.     Defendants' misrepresentations, suppression, and deceit proximately caused damage to Ms. Johnson and the Alabama Subclass, including exposure to punitive termination penalties, lease payment, and a cloud on title and lien risk.

86.     Ms. Johnson and the Alabama Subclass request compensatory and punitive damages, rescission of their lease agreements and restitution, attorney's fees and costs, and other appropriate equitable relief as allowed under Ala. Code §6-5-100 *et seq.* and Alabama common law.

## COUNT IV:
## CIVIL CONSPIRACY
## AGAINST ALL DEFENDANTS
### (On behalf of the Alabama Subclass)

87. Ms. Johnson incorporates the foregoing allegations here by reference.

88. Defendants are separate, distinct corporate entities that combined and agreed to implement and profit from the "Advantage Program" scheme described above.

89. The object of the combination was unlawful and/or was pursued by unlawful means, including: (a) misrepresenting and suppressing material facts during in-home solicitations; (b) consummating purported "leases" without providing clear, conspicuous, retainable FCLA/Reg M disclosures prior to consummation; (c) failing to comply with ESIGN and UETA requirements before using electronic records and signatures; (d) withholding Cooling-Off Rule notices and forms at the time of the home solicitation; and (e) imposing punitive early-termination charges and liens/clouds on title.

90. In furtherance of the agreement, each Defendant committed overt acts, including but not limited to: (a) Service Experts' local sales agents conducting high pressure in-home pitches that characterized the transaction as low-cost "financing" while concealing the lease, total cost, penalties, and lien terms; (b) capturing a "signature" on a tablet before making the required disclosures; (c) transmitting a corporate "Welcome Letter" and attachments after the fact, including unsigned "Advantage Terms and Conditions;" (d) installing equipment and then attempting to upsell additional work; and (e) recording or threatening to record liens and invoking early termination penalties to coerce payment.

91. Defendants acted with knowledge of, and intent to further, the common plan: SE Corporate owned and controlled the Advantage branding and program architecture; SE HVAC operated and controlled local "Service Experts" shops that executed the in-home sales and

18

installations; Advantage served as the nominal "lessor" on Advantage paperwork.

92. The agreement and overt acts were directed to and occurred in Alabama, including at Ms. Johnson's home, and were part of a uniform, scalable sales playbook Service Experts deployed nationwide.

93. As a direct and proximate result of the conspiracy and the overt acts of each co-conspirator, Ms. Johnson and the Alabama Subclass sustained injury, including but not limited to: (a) lease payment obligations and/or payments made; (b) exposure to and attempted collection of punitive early-termination charges far exceeding installed costs; (c) liens or clouds on title and associated costs and risks; (d) deprivation of statutory disclosure and cancellation rights; (e) loss of the benefit of bargain; and (f) consequential, incidental, and statutory damages, plus attorneys' fees.

94. Each Conspiracy Defendant is jointly and severally liable for the wrongs committed by any other co-conspirator in furtherance of the agreement.

95. Plaintiff and the Class seek all remedies available for the underlying wrongs furthered by the conspiracy, including compensatory, punitive, statutory, and treble damages, declaratory relief and restitution, recission, lien expungement, and attorney's fees and costs.

## COUNT V:
### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
### ON DEFENDANTS' PRACTICES
### AGAINST ALL DEFENDANTS
**(on behalf of the Nationwide Class and Alabama Subclass)**

96. Ms. Johnson incorporates the foregoing allegations here by reference.

97. An actual controversy exists regarding the enforceability of Defendants' lease obligations and related terms, and whether Defendants may impose termination charges or record notices/security interests based on the challenged sales and disclosure process.

98.     Defendants' challenged practices are ongoing. Defendants continue to market and sell the Advantage Program through standardized in-home scripts and a uniform paperless contracting workflow that closes transactions at the point of sale while delivering dense lease terms only afterward by email. As demonstrated by Ms. Johnson's experience and Defendants' notice of repeated consumer complaints, absent court ordered relief Defendants' practices will continue to mislead consumers and cause harm.

99.     Plaintiff seeks a declaration that Defendants' practices violate applicable law and an injunction narrowly tailored to prevent future harm, including an order requiring that, for any in-home Advantage Program transaction, Defendants must—before consummation and before obtaining any consumer signature—provide the consumer with a complete copy of the lease terms and conditions and all required disclosures in a form the consumer may keep.

100.    Plaintiff also seeks injunctive relief requiring Defendants to implement uniform, administrable reforms, including:

(a)     Curative disclosure package for existing lessees: provide all current/affected lessees a complete copy of the lease terms and conditions and all required disclosures in paper (or a readily retainable electronic copy), including the early termination schedule and any security-interest/title-notice language, together with a plain-language notice of key terms and cancellation/dispute procedures;

(b)     Enforcement guardrails: prohibit Defendants from demanding or collecting early termination charges, referring accounts to collections, furnishing information to consumer reporting agencies, or recording/publishing any notice affecting title/ownership unless Defendants can prove that, before consummation and before signature, the consumer received the complete terms and required disclosures in a form the consumer could keep and that Defendants obtained any required electronic-consent/ESIGN disclosures and acknowledgments;

(c)     Pre-consummation retainable copy requirement going forward: for any in-home Advantage Program transaction, require Defendants—before consummation and before obtaining any consumer signature—to provide the consumer with a complete copy of the lease terms and conditions and all required disclosures in a form the consumer may keep, including a paper copy (or, at the consumer's election, an immediately retainable onsite electronic copy), and to obtain a separate written acknowledgment of receipt and retention before signature; and

(d)     Recordkeeping and audit trail: require Defendants to maintain records sufficient to demonstrate compliance, including timestamps and audit trails for document delivery and consumer acknowledgment, and to preserve those records for a defined period.

101.     The requested injunctive relief is narrowly tailored to the standardized mechanism of harm alleged—Defendants' uniform in-home sales and paperless contracting workflow—and is readily administrable and compliance-ready.

## COUNT VI:
## DECLARATORY JUDGMENT ON ARBITRATION AND CLASS WAIVER AGAINST ALL DEFENDANTS

102.     Ms. Johnson incorporates the foregoing allegations here by reference.

103.     An actual, present controversy exists regarding: (a) whether any contract was formed between Ms. Johnson and any Defendant in connection with the Service Advantage Agreements; (b) the existence, validity, scope, and enforceability of the arbitration and class action waiver language contained in the "Service Advantage Agreements;" (c) who, if anyone, may enforce those provisions; and (d) whether Plaintiff may pursue equitable relief in this Court.

104.     Defendants cannot compel arbitration because no enforceable agreement to arbitrate was ever formed. Ms. Johnson was never shown an arbitration provision at the time of the in-home signing, did not understand she was entering into a lease agreement, and did not receive the relevant contractual terms in a form she could retain before being bound. Defendants' attempt to enforce arbitration fails independently for multiple reasons, each of which precludes arbitration as a matter of law.

### A.     No contract formation

105.     Ms. Johnson did not assent to the nature, character, or essential terms of the documents Defendants now call the "Service Advantage Agreements" and "Advantage Terms and Conditions."

21

106. Advantage failed to comply with the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. §7001(c), in that, before delivering any disclosures or contract terms electronically, they did not provide clear and conspicuous ESIGN consumer disclosures, did not disclose hardware/software requirements, did not obtain Ms. Johnson's affirmative consent to electronic delivery, and did not reasonably demonstrate her ability to access and retain the records.

107. Advantage also failed to associate Ms. Johnson's electronic signature with the specific agreement purportedly signed and to furnish a retainable copy at or before consummation, contrary to ESIGN §§7001(c)–(d) and UETA (Ala. Code §8-1A-7, 9, 12). Accordingly, any disclosures required "in writing" (including cancellation notices) were not validly provided, there was no mutual assent to the purported terms, and the arbitration/class action waiver and recurring debit authorization are unenforceable.

108. Moreover, the "customer" in the Service Advantage Agreement is not Ms. Johnson. Therefore, no contract was formed between Ms. Johnson and any Defendant. Where there is no contract, there is no arbitration clause and no class waiver to enforce.

**B.      Fraud in the execution and inducement**

109. If a contract was formed, it is void for fraud.

110. Advantage's contracting agent, Mr. Morris, represented that Ms. Johnson was signing "a credit check" when she signed the tablet he brought to her home. Therefore, Ms. Johson's signature was obtained by fraud in the execution, thus voiding any contract.

111. Moreover, Advantage's agent, Mr. Morris, made material misrepresentations and suppressed material facts about the transaction with an intent to deceive Ms. Johnson. Mr. Morris misrepresented the nature of the Advantage Program by misrepresenting the Advantage Program as low-cost purchase program with low monthly payment. He suppressed that material facts about

22

the transaction – that involved a one-sided ten-year lease that tripled the cost of the equipment, contained a forced arbitration and class waiver clause and gave Advantage a lien interest on her home.

112.    Therefore, if a contract was formed, it is voidable because Advantage obtained assent through material misrepresentations and omissions that constitute fraud in the inducement.

### C.    Failure of incorporation by reference

113.    If an enforceable contract was formed, the "Advantage Terms and Conditions" document and its arbitration and class waiver provisions are not part of that contract.

114.    The three Service Advantage Agreements provide:

> G.    **Other important Terms**: See your **Lease** for additional information on early termination, maintenance responsibilities, warranties, late and default charges, insurance and any security interest.

Exhibit 3 at 1, 3, and 5 (emphasis added).

115.    Ms. Johnson was not provided a document entitled "Lease" that contains "additional information" at any time.

116.    The "Advantage Terms and Conditions" attached to the email were not signed by Ms. Johnson and she never saw them prior to May 9. None of the Service Advantage Agreements mention or incorporate a document entitled "Advantage Terms and Conditions."

117.    Incorporation by reference requires clear identification of the external document so that an ordinary consumer knows what document is being incorporated. A generic pointer to a non-existent "Lease" does not incorporate a different, separately named document ("Advantage Terms and Conditions") and cannot smuggle in its arbitration and class waiver terms.

118.    The title mismatch creates at best a latent ambiguity regarding what "governs," which must be resolved against the drafter and against enforcement of hidden waivers. The

23

ambiguity is compounded by the timing and delivery issues alleged: the "Advantage Terms and Conditions" were not provided in a retainable form before consummation of the transaction.

119. Because the disclosures do not clearly and conspicuously incorporate the Advantage Terms and Conditions, there was no meeting of the minds on those additional terms. The arbitration provision and class-action waiver contained the unsigned, unreferenced Advantage Terms and conditions thus cannot be enforced by any Defendant.

**D. Unconscionability**

120. If the Advantage Terms and Conditions are part of the contract, the arbitration and class waiver provisions are unenforceable.

121. The arbitration section of the Service Advantage Agreements is procedurally and substantively unconscionable, including a shortened claim deadline, certified/registered mail preconditions, and attempts to displace consumer-protective administrator rules, and is further infected by illusory unilateral-change language. These provisions create unfair surprise, lack mutuality, and operate as forfeiture traps.

122. Furthermore, the forced arbitration and class waiver scheme contained in the Advantage Terms and Conditions is non-mutual and illusory. It reserves courtroom remedies for the drafter (injunction/specific performance), and in practice, Advantage routinely files suit in Alabama courts against Advantage Program customers. The Advantage Terms and Conditions also purports to override AAA rules, imposes a certified mail and one-year cutoff traps, and retains unilateral amendment power—confirming substantive unconscionability and defeating enforcement.

123. Furthermore, Advantage failed to provide the arbitration and class waiver terms in a manner Ms. Johnson could review and retain before consummation, used after-the-

24

fact electronic links or acknowledgments, and relied on mismatched identity information that does not name Ms. Johnson as the contracting party. The result is no meeting of the minds on the alleged Service Advantage Agreements

### E.    Non-signatories Defendants cannot enforce arbitration

124.    If Advantage can enforce the arbitration and class waiver provisions, the other Defendants cannot because they are not parties to the contract.

125.    The only Defendant named in the Service Advantage Agreements and Advantage Terms and Conditions is Advantage, and those documents do not confer enforcement rights to or protections to parents, affiliates, franchisees, marketing partners, or agents. SE Corporate, SE HVAC cannot enforce the arbitration and class waiver provisions contained in agreements they did not sign.

### F.    Declarations Requested

126.    Ms. Johnson seeks a declaration that:

a.    No contract was formed between Ms. Johnson and Defendants;

b.    If a contract was formed by Ms. Johnson and Defendants, it is void;

c.    Any contract between the parties does not include the Advantage Terms and Conditions;

d.    The arbitration and class waiver provisions of the Advantage Terms and Conditions are unenforceable.

e.    SE Corp and SE HVAC cannot enforce the arbitration and class waiver provisions of the Advantage Terms and Conditions;

f.    Ms. Johnson may pursue equitable relief in this Court notwithstanding any arbitration language.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Juanita Johnson, individually and on behalf of the Nationwide Class and the Alabama Subclass, respectfully prays that the Court enter judgment in her favor and against Defendants, and award the following relief:

a.    Certify the proposed Class and Subclasses under Rule 23; appoint Plaintiff as Class Representative; and appoint Plaintiff's counsel as Class Counsel;

b.    Enter the declaratory judgments requested;

c.    Enter an order requiring the injunctive relief requested;

d.    Order rescission of any purported Advantage agreement(s) and award restitution and/or disgorgement;

e.    Award damages available under the Federal Consumer Leasing Act and Regulation M, including actual damages, statutory damages under 15 U.S.C. §1640 (including up to 25% of the total of monthly payments due under the lease and class statutory damages as permitted), and reasonable attorneys' fees and costs;

f.    Award actual, treble, and statutory damages and attorneys' fees/costs under the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-10;

g.    Award compensatory and punitive damages on the fraud-based counts (misrepresentation/suppression) as permitted by Alabama law;

h.    Enter judgment holding each Defendants jointly and severally liable for all damages and equitable relief flowing from the underlying wrongs furthered by their civil conspiracy;

i.    Award pre-judgment and post-judgment interest at the maximum rates allowed by law;

j.    Award reasonable attorneys' fees, litigation expenses, and costs; and

k.    Grant all just and proper relief.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED this 13th day of January, 2025.

Respectfully submitted,

*/s/ Jason W. Earley*
Jason W. Earley
**JENNINGS & EARLEY PLLC**
3500 Blue Lake Drive, Suite 430
Birmingham, AL 32543
Tel: 205-905-7878
jason@jefirm.com

## DEFENDANTS TO BE SERVED VIA CERTIFIED MAIL AS FOLLOWS:

Service Experts, LLC
c/o Corporation Service Company, Inc.
211 E. 7th Street, Suite 620
Austin, Texas 78701

Service Experts Heating & Air Conditioning LLC
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, Alabama 36104

Advantage Experts Services LLC
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, Alabama 36104